IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALAN BASS, | § | |
| | § | |
| | § | No. 218, 2022 |
| Defendant Below, Appellant, | § | |
| | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| | § | |
| STATE OF DELAWARE, | § | I.D. No. 83000508DI (N) |
| | § | |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: April 19, 2023
Decided: June 20, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Patrick J. Collins, Esquire, Collins & Price, Wilmington, Delaware for Appellant.

Brian Arban, Esquire, Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

## I.       Introduction

In June 1983, a Superior Court jury found Alan Bass ("Bass") guilty of two counts of Rape First Degree, three counts of Kidnapping First Degree, two counts of Robbery First Degree, one count of Attempted Robbery First Degree, two counts of Burglary Second Degree, and one count of Burglary Third Degree. The Superior Court sentenced Bass to five consecutive life sentences plus 45 years in prison. Bass appealed. In September 1985, this Court affirmed his convictions.[1]  The rapes, kidnappings, robberies, and burglaries were committed in Wilmington and Claymont between November 1981 and August 1982.

Before the instant postconviction motion on appeal, Bass filed six motions for postconviction relief.[2]  All six motions were denied. After Bass's six prior Rule 61 motions, on April 20, 2015, the Federal Bureau of Investigation ("FBI"), the United States Department of Justice ("USDOJ"), the Innocence Project, and the National Association of Criminal Defense Lawyers issued a joint statement (the "Joint Statement") in which the

---

[1] *Bass v. State*, 505 A.2d 451, 1985 WL 188333 (Del. Sept. 20, 1985) (TABLE); App. to Opening Br. at A699–708 (Order Denying Direct Appeal and Affirming Superior Court Judgment, Sept. 20, 1985) [hereinafter Denial of Direct Appeal].

[2] *See Bass v. State*, 561 A.2d 466, 1989 WL 47282 (Del. Apr. 5, 1989) (TABLE) (affirming denial of first motion for postconviction relief); *Bass v. State*, 634 A.2d 938, 1993 WL 478076 (Del. Nov. 5, 1993) (TABLE) (affirming denial of second motion for postconviction relief); *Bass v. State*, 710 A.2d 217, 1998 WL 231270 (Del. May 1, 1998) (TABLE) (affirming denial of third motion for postconviction relief); *Bass v. State*, 829 A.2d 935, 2003 WL 21810837 (Del. Aug. 4, 2003) (TABLE) (affirming denial of fourth motion for postconviction relief); *Bass v. State*, 67 A.3d 1022, 2013 WL 2398580 (Del. May 31, 2013) (TABLE) (affirming denial of fifth motion for postconviction relief). Bass took no appeal from the denial of his sixth motion for postconviction relief. *See State v. Bass*, 2014 WL 4793005 (Del. Super. Sept. 26, 2014) (denial of sixth motion for postconviction relief). Bass also unsuccessfully petitioned the United States District Court for the District of Delaware for federal habeas relief. *Bass v. Redman*, C.A. 89-278, slip op. (D. Del. June 19, 1990) (recommending denial of petition for federal habeas relief), *adopted*, (D. Del. Dec. 26, 1990) (ORDER), *cert. of appealability denied*, No. 91-3043, slip op. (3d Cir. Apr. 5, 1991).

FBI announced the results of a years-long investigation into whether trial testimony by FBI forensic examiners contained erroneous statements regarding microscopic hair comparison ("MHC") analysis used in certain cases.[3] It announced that in cases prior to December 31, 1999, 26 of 28 FBI MHC examiners testified erroneously, and "[i]n the 268 cases where examiners provided testimony used to inculpate a defendant at trial, erroneous statements were made in 257 (96 percent) of the cases."[4] In a June 2015 letter, the USDOJ/FBI notified the Delaware Department of Justice ("Delaware DOJ") that their joint review determined that the testimony of the FBI forensic examiner who testified in Bass's case, Andrew Gary Podolak ("Podolak"), "included statements that exceeded the limits of science."[5] Specifically, the USDOJ/FBI determined that Podolak stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others.

Following the USDOJ/FBI's disclosure, Bass filed his seventh Rule 61 motion, with assistance of appointed counsel, wherein he asserted claims of actual innocence as well as two constitutional due process challenges under the 14th Amendment to the United States Constitution. Bass sought a new trial or the dismissal of his indictment.

As part of his seventh Rule 61 motion, Bass asserted that the USDOJ/FBI's 2015 acknowledgment regarding the limitations of the MHC testimony constituted "new"

---

[3] App. to Opening Br. at A994–98 ("FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review," dated Apr. 20, 2015) [hereinafter Joint Statement].

[4] *Id.* at A996.

[5] *Id.* at A18 (Letter from Norman Wang, Special Counsel, U.S. DOJ, to Honorable Matt Denn, Delaware Attorney General (June 25, 2015)) [hereinafter 2015 Letter]. The USDOJ/FBI took no position regarding the materiality of the error in this case.

evidence that creates a strong inference that he is actually innocent in fact of the charges of which he was convicted.[6] According to Bass, without this improperly admitted testimony, the State's remaining evidence was insufficient to support a conviction. As a result, he asserted that the State's use of this unreliable hair evidence violated his right to a fair trial and that he is entitled to a new trial.

Bass raised a second constitutional challenge after supplementing his initial Rule 61 motion.[7] He asserted that the State's failure to dismiss his indictment violated due process and demonstrated disparate treatment in view of the Delaware Attorney General's dismissal of an indictment in another case involving hair comparison evidence.[8]

Bass's Rule 61 motion was referred to a Superior Court Commissioner pursuant to 10 *Del. C.* § 512(b) and Superior Court Criminal Rule 62(a)(5). The Commissioner issued her Report and Recommendation ("Commissioner's Report") concluding that Bass's Rule 61 motion should be denied.[9] The Superior Court affirmed the denial.[10] Bass appealed the Superior Court's judgment. Oral argument before this Court occurred on April 19, 2023.

---

[6] *Id.* at A868 (Motion for Postconviction Relief, dated Apr. 26, 2018).

[7] *Id.* at A1010–58 (Supplemental Memorandum in Support of Postconviction Relief, dated Nov. 23, 2020).

[8] The other case was *State v. Daniels*, ID No. 87002394DI.

[9] *State v. Bass* (*Commissioner's Report*), 2021 WL 5984262, at *1 (Del. Super. Dec. 15, 2021).

[10] *State v. Bass* (*Super. Ct. Op.*), 2022 WL 2093956, at *1 (Del. Super. June 10, 2022).

*A.     Facts*

Three separate incidents underlie Bass's June 1983 convictions. Each occurred between November 1981 and August 1982 in Wilmington and Claymont. The attacks, which involved three separate women, occurred within a few miles of where Bass was living in Delaware.

*1.     Attack on S.K. – November 1981*

The first attack occurred on November 10, 1981, about a mile from where Bass was living in Delaware. At around 7:00 p.m., 20-year-old S.K. was finishing up her workday at a Northern Wilmington law office. While S.K. was speaking to a friend on the phone, a thin, well-dressed Black male entered the law office where she worked. He was wearing surgical gloves and carried a bag.[12] He rushed to her and stuck a sharp object, which police later identified as a screwdriver, into her side. The man demanded that she not look at him, hang up the phone, and give him the petty cash that was in her office drawer. After taking the cash, the man ordered S.K. to call her friend back and tell the friend that she hung up because someone came into the office who needed her assistance, but that she would call back later. The man then went through S.K.'s purse and stole her watch, bracelet, and gold ring.

---

[11] Unless otherwise noted, facts are taken from the *Commissioner's Report*, 2021 WL 5984262, at *1–14, *see* App. to Opening Br. at A1238–58, and the *Super. Ct. Op.*, 2022 WL 2093956, at *1–8.

[12] S.K. testified that she viewed her assailant for "about a minute." App. to Opening Br. at A135 (S.K. Trial Test. at 29:18).

After taking S.K.'s jewelry, the man locked the front door and led S.K. to a conference room at the back of the law office. He again directed her not to look at him and covered her face by pulling her sweater up over her head. He had her lie face down on the floor, where he tied her feet with telephone wire he found in the office. He then directed her to stand up and remove her underwear and pants. The assailant did the same. He then made S.K. lie face up on the floor, with the sweater still blocking her view, and forced her to help him penetrate her vaginally. He raped her for 20 to 30 seconds but had trouble maintaining an erection. He did not ejaculate.

After raping her, the assailant got dressed and allowed S.K. to do the same. While she was putting on her clothes, S.K. caught a glimpse of her attacker's face. The assailant then stuck her in the side with the sharp object and ordered her to sit down while he tied another secretary's sweater around S.K.'s neck and put it in her mouth. He placed another sweater found in the office over her head. Finally, he tied S.K.'s hands behind her back, told her not to call the police, and left. Shortly after he left, S.K. untied herself and called her boyfriend and her employer. The police arrived at the scene shortly after S.K.'s boyfriend. They found a screwdriver in the conference room where S.K. had been tied up.

### 2. *Attack on A.S. – July 1982*

Eight months later, on July 10, 1982, at around 9:30 a.m., 26-year-old A.S. was beginning work alone in her office on the third floor of an insurance company in Claymont. She looked up from her work when a well-dressed, thin Black man entered her office. She viewed his face for 10 to 30 seconds before he ran to her and stuck a screwdriver in her

6

side. He wore dark glasses and a cardigan sweater over his head, which covered the sides of his face and his hair.

The man forced A.S. to look at the floor and asked if she had any money. She offered him her checks from her purse. Taking her purse, he emptied its contents on the desk and then tore the strap off of her purse. The attacker then gagged A.S. by tying his sweater over her head, making it so she could only see his shoes.

The assailant then ordered A.S. to lead him around the office. After looking into other offices and making A.S. point out nearby exits, the man led A.S. into a conference room. He demanded her wedding and engagement rings, despite A.S.'s pleading for him not to take them. The assailant refused, threatened to kill her, punched her, took the rings, and then tied her hands and feet. He removed her underwear and pants and undressed himself. The man proceeded to vaginally rape A.S. for 60 to 90 seconds but, similar to the assailant in S.K.'s rape, had trouble maintaining an erection. He seemed frustrated, gave up, and said "forget it." He then redressed himself and A.S., retied A.S.'s hands and feet, covered A.S. with a raincoat, and left the building. A.S. waited about an hour before fleeing the office to a nearby restaurant, where she called the police and her husband.

Eight days before the attack on A.S., on July 2, 1982, a robbery was committed at the same insurance company in Claymont. The checkbook and dictating machine of A.S.'s co-worker, William Stevens, were stolen from his desk. That same day, Bass's long-time friend, Loretta Schoell, cashed a forged check belonging to William Stevens. Bass had given her the stolen check one or two hours beforehand. A dictating machine of the same

7

make, model, and description as that stolen from Mr. Stevens' office was found in Ms. Schoell's car.

3. *Attack on S.M. – August 1982*

About a month and a half later, on the morning of August 26, 1982, 30-year-old S.M. was working alone in her North Wilmington office when she was suddenly approached from behind by a man who covered her mouth. S.M. asked her assailant what he wanted. He responded by telling S.M. to shut up and asking if she had any money. S.M. said she had none.

The man then forced S.M. into a windowless lab room and struck her on the head. He became angry when S.M. tried to convince him the police were on the way to her office because her purse had been stolen weeks earlier. The assailant accused S.M. of lying and ordered her to kneel and to shut up. At some point during the assault, S.M. lost control of her bladder and urinated on herself. Shortly afterward, S.M. heard her assailant leave the room. He was in the office for a total of about three to five minutes. She then armed herself with a metal object and called the police. S.M. never saw her assailant's face.

Six weeks before the attack, on July 16, 1982, S.M. attended a party in the same office building where she was assaulted. She placed her purse, containing her wallet, under her desk for the day. At some point later in the day, S.M. was returning from the restroom when she passed by a tall, thin Black man with glasses in the hallway. After he passed, he stopped, turned around, and looked at her. The man wore a blue shirt, a light jacket, and pants. The next day, S.M. noticed that her wallet was missing, which contained her

8

checkbook, money, and credit cards. Two of the stolen checks were later forged and cashed by Bass's friend, Ms. Schoell.

### B. The Procedural Background

#### 1. The Trial

Bass's trial began on May 31, 1983 and lasted four days. The State presented evidence against Bass at trial, including, but not limited to, the assailant's race, height, build, voice, facial features, clothing, and shoes. The State elicited testimony from various witnesses relating to the identification of the assailant and the similarities between the three incidents. All three victims, as well as law enforcement, two eyewitnesses, and Bass's friend, Ms. Schoell, testified at trial. Two witnesses, including one of the victims, positively identified Bass at trial as the assailant. Bass testified in his defense.

#### a. Victim Testimony

#### i. S.K.

During her trial testimony, the first victim, S.K., described the physical attributes of the man who attacked her and positively identified Bass as that man. She stated that the attacker was a 20- to 30-year-old Black male with a dark complexion, somewhere between 5'8" to 5'10", and slightly thin. She was not sure whether he had a mustache. He had a deep, soft-spoken voice. She testified that the man wore a hat, dark sunglasses, a black sports jacket, a white turtleneck, and dark dress pants.[13]

---

[13] S.K. testified that she did not remember the shoes her assailant wore. *Id.* at A136 (S.K. Trial Test. at 30:9–10).

S.K. also testified about her opportunities to identify her attacker before trial. She explained that she directed a composite photograph of her assailant, even undergoing hypnosis to do so, but was never confident of the resulting sketch.[14] She further testified about an opportunity that she had to identify individuals that looked similar to her assailant during a live lineup, and to identify Bass in a photographic lineup. In December 1981, the detective investigating S.K.'s case presented her with a live lineup of six Black males. Bass was not among them. S.K. rated one of the individuals as an "eight" on a scale from one to 10 in resemblance to her attacker but did not positively identify any of the individuals as her assailant. In October 1982, almost a year after her attack, the detective investigating S.K.'s case presented her with a photographic lineup that included Bass. S.K. did not identify Bass from that lineup.

Finally, at trial in June 1983, approximately 19 months after her attack, S.K. positively identified Bass. She confirmed on direct examination that she had no doubt in her mind that Bass was her rapist and explained on redirect examination that she had been previously unable to identify Bass as her assailant because she had not seen him in person, and she did not think the photographs alone "really show[ed] it all."[15]

ii. A.S.

The second victim, A.S., also described the assailant at trial, whom she had an opportunity to view for 10 to 30 seconds before he reached her. A.S. testified that her

---

[14] *Commissioner's Report*, 2021 WL 5984262, at *5.

[15] *Id.* at *6.

attacker was a thin Black male, with a medium complexion, between 5'11" and 6'0" tall, in his early thirties, and having an older sounding voice. She thought he had a slender build, a thin jaw line and hollow cheeks, with a thin growth of hair on his chin. She testified that her assailant covered his head with a cardigan sweater and wore black-framed dark plastic sunglasses with dark lenses, and possibly a short-sleeved shirt with dark polyester pants. His shoes were medium gray slip-ons with a soft crepe sole. The State showed A.S. the shoes they had obtained from Bass's home at trial, but she did not identify the shoes as those of her attacker. She stated that they resembled her attacker's shoes in that they were the same unusual gray color and were slip-ons, but they looked like leather instead of the suede that she remembered from her attack.

A.S. never positively identified Bass as her assailant either before trial or at trial. Instead, A.S. testified about the composite sketch she helped the police to create of her assailant. Like S.K., she was never satisfied with the sketch because it depicted her attacker with a goatee,[16] and her attacker's cheeks were hollower than the sketch showed.

A.S. had two opportunities to identify Bass in photographic lineups prior to trial — in July 1982 and October 1982 — but never made a positive identification. Police presented A.S. with the first lineup in the same month of her attack. It included a picture of Bass from 1978. A.S. picked out two individuals as resembling her attacker, noting that Bass's photograph showed a man with a similar weight and facial structure as her attacker.

---

[16] A.S. testified that rather than a goatee, her attacker had "only a few scraggly hairs." App. to Opening Br. at A240 (A.S. Trial Test. at 134:21).

11

Police showed A.S. a second photographic lineup in October 1982, which included a more recent photograph of Bass. Again, A.S. chose two photographs as picturing a man resembling her attacker, but she noted that of the two, Bass's photograph looked most like him. Once A.S. stated that Bass's photo looked most like her assailant, the detective told her that he was the suspect. The detective did not conduct a third photographic lineup.[17]

Although A.S. did not positively identify Bass as her assailant at trial, she stated that Bass "resembles the person who attacked me."[18] She further stated that her attacker was thinner than Bass and that he did not have a mustache. The State then elicited testimony from law enforcement that Bass was 15 to 20 pounds heavier at the time of trial than he was at the time of his arrest in November 1982. Bass did not object to A.S.'s in-court identification testimony. However, Bass argued for suppression of the second-array testimony for two reasons. First, none of the males in the first array appeared in the second array except Bass. Second, after A.S.'s identification of Bass's photograph, she was told by the police officer that the individual that she had selected was suspected of attacking her. The trial court denied the motion.[19]

---

[17] *Commissioner's Report*, 2021 WL 5984262, at *8. The trial court admitted testimony and evidence relating to the second out-of-court photo array over Bass's objections. As discussed below, Bass contended on direct appeal that the trial court erred in this admission. This Court denied his claims of error.

[18] *Super. Ct. Op.*, 2022 WL 2093956, at *3.

[19] The trial court found that Bass had failed to show that the procedure "was so unduly suggestive as to violate the defendant's due process rights." App. to Opening Br. at A706 (Denial of Direct Appeal at ¶ 13).

12

### iii. S.M.

The final victim, S.M., never saw her assailant's face and never positively identified Bass. She testified at trial about the facts of her assault and the facts surrounding her stolen checkbook. Although S.M. never saw the face of her attacker, she testified that the assailant was between 5'10" and 6'0" tall with a slender build and long, thin black fingers. He wore a blue shirt and had a calm voice.

She also stated that on the day her checkbook was stolen, she passed a man in the hallway on the way back from the restroom. The man was Black, tall and thin, and wore glasses, a blue shirt, light jacket, and light pants.[20] He stopped, turned around, and looked at her.

### b. Eyewitness Testimony

The State elicited testimony from two eyewitnesses during trial, both of whom testified as to the events surrounding S.M.'s attack. One of the eyewitnesses was Roger Reynolds, a building manager in the office building where S.M. was assaulted. Mr. Reynolds testified that, shortly after S.M. was attacked, he received a call from the police and began looking around the building. During his search, he noticed a man located in a bathroom stall in the men's restroom, which was about 30 feet from S.M.'s office.

Mr. Reynolds further testified that it appeared that while he was in the stall, the man's pants were up, he was not using the toilet, and his shoes were clearly visible. Mr. Reynolds described the man as Black, having facial hair, about 6'0" tall, and wearing gray

---

[20] *Super. Ct. Op.*, 2022 WL 2093956, at *8. She described his clothes as casual golf clothes. App. to Opening Br. at A381 (S.M. Trial Test. at B127:5–8).

13

suede shoes with a flat sole and heel. He confirmed at trial that the shoes obtained by the State from Bass's home "looked like the same shoes" as those worn by the man in the bathroom stall. Although Mr. Reynolds admitted that he did not see the man's entire face, he selected an individual from a photo lineup based on the "definite formation" of the man's forehead. He selected a photo of Bass.

The second eyewitness to testify at trial was Christine Shaw. Ms. Shaw testified that on the morning that S.M. was assaulted, she passed a man in the hallway who was exiting the office where the attack occurred. She viewed him for about one minute as they walked down the hallway, during which he said "hello" as he passed her. She described the man as a neatly dressed, tall, Black man, who was about 5'10" and 130 pounds. She stated he was approximately 30-years-old with a "short to medium afro," and was wearing a blue shirt, blue tweed pants, and glasses. She told the police that the man was clean shaven but at trial she could not definitively say whether he had a mustache.

Ms. Shaw positively identified Bass in a photo lineup before trial. At trial, she testified that when viewing the photo lineup, she recognized the picture of the man "as soon as [she] saw the picture," and did not have any doubt that she selected the correct person.[21] Ms. Shaw unequivocally identified Bass at trial.

### c. Loretta Schoell's Testimony

After receiving immunity from the State, Bass's long-time friend, Loretta Schoell, testified about Bass. She testified that she had known Bass about 11 years, and that he was

---

[21] *Super. Ct. Op.*, 2022 WL 2093956, at *4.

14

"like a member of her family."[22] She stated that at the time of each of the assaults, from October to December of 1981, and again from June to September of 1982, Bass lived with her at Stoneybrook Apartments in Claymont.

Ms. Schoell told the jury that during this time, Bass was unemployed and supported himself by stealing checks and credit cards from office buildings. She testified that she and Bass would target offices to commit thefts, including the offices where A.S. and S.M. were attacked. When doing so, Bass would dress up as an office worker, *i.e.*, in well-pressed clothes, so as not to stand out. Specifically, Ms. Schoell stated that on July 16, 1982, the date of S.M.'s office party, Bass went inside S.M.'s office building while she waited for him in the car. Bass returned to the car after approximately 20 minutes with S.M.'s checks. Ms. Schoell then forged and cashed two of the checks, one at a Bank of Delaware Branch and one, Check No. 950, at a Thriftway supermarket.[23]

Relatedly, the jury heard testimony from A.S.'s co-worker, William Stevens, about a stolen dictating machine, which was found in Ms. Schoell's car and matched the description of the one stolen from Mr. Stevens' desk in his and A.S.'s shared office building.[24] Ms. Schoell testified that Bass gave her a stolen check from Mr. Stevens eight days before A.S. was raped. Lastly, Ms. Schoell confirmed the same gray shoes shown to A.S. and Mr. Reynolds belonged to Bass.[25]

---

[22] *Id.*

[23] *Commissioner's Report*, 2021 WL 5984262, at *7.

[24] *Id.* at *6; App. to Opening Br. at A337 (William Stevens Trial Test. at B83:1–9).

[25] *Super. Ct. Op.*, 2022 WL 2093956, at *5.

### d. Bass's Testimony

Bass chose to exercise his constitutional right to testify at trial. He admitted to the jury that he supported himself by going into office buildings to steal checks and other valuables. He stated that, while committing the burglaries, he would never carry a weapon so that if he were caught, he would not also face a weapons charge.[26] He also stated that when he committed the thefts, he would not speak to anyone unless he had to, and that he never returned to those office buildings after he committed the thefts.[27] As to the specific incidents, Bass denied assaulting any of the victims and either denied or stated he could not recall whether he had stolen any of their valuables. Finally, Bass confirmed that the shoes shown to Ms. Schoell, A.S., and Mr. Stevens belonged to him, but stated that he purchased them in September 1982.[28]

### e. The MHC Evidence

Police collected articles of clothing, pubic hair combings, and hair samples from Bass, S.K., and A.S. The samples were sent to the FBI to undergo MHC analysis. FBI Agent Podolak analyzed samples relating to the attacks on S.K. and A.S., and testified at Bass's trial as to his findings.[29] He testified that his job as an MHC examiner was two-fold: first, to determine "whether there are any hairs present on the items which are

---

[26] *Commissioner's Report*, 2021 WL 5984262, at *4.

[27] *Super. Ct. Op.*, 2022 WL 2093956, at *5. Further, Bass testified that he had only ever gone to an office building to steal checks on weekdays. App. to Opening Br. at A552 (Alan Bass Trial Test. at C150:2–8) [hereinafter A. Bass Trial Test. at __]. A.S. was attacked on a Saturday.

[28] App. to Opening Br. at A529–30 (A. Bass Trial Test. at C128:14–C129:13).

[29] *Super. Ct. Op.*, 2022 WL 2093956, at *5.

submitted" to him, and second, to "try to make an association between those hairs and the particular individual."[30]   He explained that: "The most important part of the hair comparison is the arrangement of the characteristics in association with one another."[31] Thus, he likened the analysis to viewing a human face and stated:  "It's the arrangement of the characteristics that we have in association with each other that gives a uniqueness to the hair which then allows us to make an association of that hair to a particular individual."[32]

He then told the jury about his findings as to the hairs collected from the attacks on S.K. and A.S.  There was no MHC evidence presented at trial as to S.M.

### i. As to S.K.

Podolak testified that he found "dark brown pubic hairs of negroid origin" in the pubic hair combings taken from S.K., and that those combings matched a sample of Bass's pubic hair.[33]  Specifically, Podolak testified:  "I found dark brown pubic hairs of negroid origin, which microscopically match in every observable characteristic the known pubic hairs of Alan Bass."[34]

---

[30] App. to Opening Br. at A28 (Andrew Podolak Direct Test. at C56:9–13) [hereinafter A. Podolak Direct Test. at __]; *accord Commissioner's Report*, 2021 WL 5984262, at *11.

[31] App. to Opening Br. at A34 (A. Podolak Direct Test. at C62:12–14); *accord Commissioner's Report*, 2021 WL 5984262, at *11.

[32] App. to Opening Br. at A34–35 (A. Podolak Direct Test. at C62:22–C63:3).

[33] *Commissioner's Report*, 2021 WL 5984262, at *11.

[34] *Id.*; *accord* App. to Opening Br. at A491 (A. Podolak Direct Test. at C80:8–11).

17

## ii. As to A.S.

Similarly, Podolak testified that he "found a dark brown head hair of negroid origin [on A.S.'s clothing] which microscopically matched the known head hair sample of Alan Bass in every observable microscopic characteristic."[35] He also compared pubic hair combings taken from A.S. following her rape with pubic hair taken from Bass. He told the jury: "I found a dark brown pubic hair of negroid origin which matched in every observable microscopic characteristic the known pubic hairs of Alan Bass."[36]

## iii. Cross-Examination of Podolak

On cross-examination, Bass's trial counsel elicited the following testimony from Podolak:

- Q: It's also in the report – in the results of your examination, after you state that you made comparisons to the slide, you state in there, "Accordingly, it could have originated from Alan Bass or it could have originated from [S.K.] or it could have originated from [A.S.]." On the basis of your examinations, you are not able to positively state that, in fact, they were from Alan Bass or [S.K.] or [A.S.]. Is that correct?

- A: That's correct. Hair comparisons are not like fingerprints; they are not a hundred percent accurate.

- Q: In fact, you put a disclaimer in here that states, "It's pointed out that hair comparisons do not constitute a basis for absolute personal identification." Isn't that correct too?

- A: That's correct. I think the key word is "absolute."[37]

---

[35] *Commissioner's Report*, 2021 WL 5984262, at *11; *accord* App. to Opening Br. at A501 (A. Podolak Direct Test. at C90:15–18).

[36] App. to Opening Br. at A503 (A. Podolak Direct Test. at C92:1–3).

[37] *Id.* at A505–06 (Andrew Podolak Cross-Examination Test. at C94:20–C95:13) [hereinafter A. Podolak Cross-Examination Test. at __].

- That Podolak can determine the race of the person a hair came from, or if the person "has mixed racial characteristics" but cannot tell the gender of the person the hair came from just from examining a hair.[38]

### iv.    *Redirect Examination of Podolak*

On redirect examination, the State elicited the following testimony from Podolak:

- Podolak, over defense counsel's objection, testified that "[b]eing an expert in the area of hair comparisons and hair itself, my opinion is that negroid hairs are much easier to identify and compare than caucasian or mongoloid hairs."[39]

- Podolak testified that microscopic hair comparisons do not constitute a basis for absolute personal identification, but over the years, "we have persisted in that hair comparisons are a very good means of identification, not a hundred percent, but a very good means of identification."[40]

- Podolak, over defense counsel's objection, discussed a then-recent Minnesota academic study conducted to "determine the evidential value of hair comparisons. In other words, what percent of the time or what percentage of the time can an analyst say, when he takes a questioned hair, he can make an association to a particular individual."[41] He noted it was an "introductory study," "not a complete study."[42] He described the study in which a hair examiners matched "questioned" hair samples with "known" hair samples 100% of the time. He stated that "the morphology of human head hairs is an individual characteristic of identity, and that they are -- this affirms that this is a good reliability or a very good ability of an analyst to take a questioned hair and match it to an individual in a crime situation."[43]

- Podolak stated that he had conducted "over three thousand hair comparisons so far," and that he "ha[d] yet to find hairs from two different

---

[38] *Id.* at A506–07 (A. Podolak Cross-Examination Test. at C95:14–C96:23).

[39] *Id.* at A73 (Andrew Podolak Redirect Test. at C101:12–15) [hereinafter A. Podolak Redirect Test. at __].

[40] *Id.* at A75 (A. Podolak Redirect Test. at C103:6–9).

[41] *Id.* at A508 (A. Podolak Redirect Test. at C104:9–16).

[42] *Id.* (A. Podolak Redirect Test. at C104:19–20).

[43] *Id.* at A508–10 (A. Podolak Redirect Test. at C106:5–12).

individuals that [he could] not distinguish between their hair characteristics."[44]

### v.  *Recross Examination of Podolak*

On recross examination, Bass's trial counsel elicited the following testimony from Podolak:

- Podolak agreed that "you could have two samples from the same head and they would not be microscopically similar" because "[t]hat's all part of the individual's identity or the uniqueness of the individual's hair."[45] However, "each individual has a variation in the hairs on their head, but the variation between one hair and the other is very minute compared to the variation from one individual to another."[46]

The State rested its case following Podolak's testimony.[47]

### f.  *The Verdict and Sentence*

On June 8, 1983, the jury returned guilty verdicts against Bass on all charges including two counts of Rape First Degree, three counts of Kidnapping First Degree, two counts of Robbery First Degree, one count of Attempted Robbery First Degree, two counts of Burglary Second Degree, and one count of Burglary Third Degree. On January 24, 1984, the trial court sentenced Bass to five life sentences plus 45 years.[48]

---

[44] *Id.* at A510 (A. Podolak Redirect Test. at C106:20–22).

[45] *Id.* at A512 (Andrew Podolak Recross Test. at C108:1–7) [hereinafter A. Podolak Recross Test. at __].

[46] *Id.* (A. Podolak Recross Test. at C108:17–19).

[47] Unfortunately, the transcripts of the opening statements and closing summations are unavailable as these proceedings were never previously transcribed. *Commissioner's Report*, 2021 WL 5984262, at *3.

[48] App. to Opening Br. at A600–02 (Sentencing Order, dated Jan. 24, 1983).

## 2.    *Direct Appeal*

Bass appealed his conviction to this Court.  On direct appeal, Bass challenged his convictions involving S.K. and A.S.  He challenged two evidentiary rulings.  First, he argued that the trial court reversibly erred in admitting the Minnesota study introduced during Podolak's redirect examination (the "Minnesota Study"), described above, because (i) in the absence of proof of its general acceptance in the scientific community, it was inadmissible under *Frye v. United States*,[49] and (ii) the study's conclusions were potentially misleading simply by being the "initial study" of its kind, and, therefore, it was potentially misleading and inadmissible under Delaware Rule of Evidence 403.[50]  Second, he asserted that the trial court committed reversible error in not suppressing, as unduly suggestive, A.S.'s second out-of-court photo array identification of Bass.

Denying Bass's first claim, this Court found that *Frye* did not apply because Podolak's testimony did not depend on the study, and he drew only limited conclusions from it.  Further, Podolak had conceded on cross-examination and redirect examination that MHCs were not without error or always accurate.  Thus, this Court found no error or abuse of discretion in the admission of the Minnesota Study.

---

[49] 293 F. 1013 (D.C. 1923).  *Frye's* "general acceptance" test for determining the admissibility of expert opinions was superseded by the adoption of the Federal Rules of Evidence as noted in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993), which was decided a decade after Bass's trial.  We adopted *Daubert* six years after that in *M.G. Bancorporation v. Le Beau*, 737 A.2d 513, 522 (Del. 1999) (stating that "[a]lthough this Court is not bound by the United States Supreme Court's interpretation of comparable rules of procedure or evidence, we hereby adopt the holdings of *Daubert* and *Carmichael* as the correct interpretation of Delaware Rule of Evidence 702") (referring to *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)).

[50] App. to Opening Br. at A701–02 (Denial of Direct Appeal at ¶ 5–6).

As to the trial court's admission of A.S.'s second out-of-court photo array identification of Bass, this Court noted that A.S. was unable to make a positive identification of Bass as her assailant. Rather, she could only state that Bass resembled her attacker. This Court agreed with the trial court's conclusion that the victim's "less than positive identification" testimony should be admitted, subject to the right of cross-examination and to argument concerning the weight to be accorded the evidence by the trier of fact.[51]

We also rejected Bass's "altered argument on appeal" that the second array identification procedure was so unnecessarily suggestive as to violate his due process rights.[52] We stated that "[i]dentification testimony, to be admissible, need only be reliable and need not be established to a certainty."[53] Further, "[i]dentification testimony that is tentative is to be evaluated by the trier of fact as any other evidence."[54] "Whether there is a substantial likelihood of misidentification turns on a consideration of the totality of the evidence."[55] With those points in mind, this Court held:

> [A.S.'s] challenged testimony was remarkably consistent with her unchallenged in-court testimony eight months later. Since [A.S.'s] identification of defendant in the second array procedure was no more or less positive than her later in-court testimony, her out-of-court testimony cannot

---

[51] *Id.* at A706 (Denial of Direct Appeal at ¶ 13).

[52] *Id.* (Denial of Direct Appeal at ¶ 14). This Court observed that Bass's remaining ground for suggestiveness "could only have tainted a third photographic array and may explain the State's withdrawal of that evidence from the case."). *Id.* at A707; *see also Commissioner's Report*, 2021 WL 5984262 at *8 (finding that "[h]aving already told A.S. that Bass was the suspect, the detective aborted the third photographic lineup").

[53] *Id.* at A707 (Denial of Direct Appeal at ¶ 15) (citations omitted).

[54] *Id.* (citing *United States v. Sublet*, 644 F.2d 737, 742 (8th Cir. 1981)).

[55] *Id*.

22

be said to have been unreliable in the sense of being likely to lead to misidentification of defendant at trial so as to deprive him of a fair trial. Finally, as previously noted, the State's testimony linking defendant to the crimes involving [A.S.] was not limited to [A.S.'s] identification testimony.[56]

### 3. Postconviction Motions

Following the denial of his direct appeal, Bass filed six *pro se* motions for postconviction relief under Rule 61.[57]  None of them asserted a claim regarding microscopic hair evidence, and all were denied or dismissed, including the most recent one in 2014.

### 4. The USDOJ/FBI Investigation

After Bass's six prior Rule 61 motions, the FBI, along with the USDOJ, engaged in a years-long review of MHC reports and testimony provided by FBI forensic examiners from cases prior to December 31, 1999.  The review focused on cases where improper trial testimony may have overstated the conclusions that properly could have been drawn from the hair comparison analysis.

As a result, the USDOJ, the FBI, the Innocence Project, and the National Association of Criminal Defense Lawyers issued the Joint Statement, announcing that 26 of 28 FBI MHC examiners had testified erroneously, and that in 268 cases where examiners provided testimony used to inculpate a defendant at trial, erroneous statements were made in 257 of those cases (96 percent of the cases).[58]

---

[56] *Id.* at A707–08 (Denial of Direct Appeal at ¶ 15) (internal citation omitted).

[57] *See supra* note 2.

[58] *See* App. to Opening Br. at A994–98 (Joint Statement).  The Joint Statement states that:

In June 2015, the USDOJ notified the Delaware DOJ that the FBI's review determined that the testimony of the FBI forensic examiner who testified in Bass's case, Podolak, "included statements that exceeded the limits of science."[59] The appendix to Bass's opening brief contains a letter dated June 25, 2015 from Special Counsel Norman Wong of the USDOJ to Delaware Attorney General Matt Denn reflecting this notification (the "2015 Letter").[60] The 2015 Letter identified the three types of errors generally, and then identified the specific errors in Bass's case as follows:

**Error Identified in this Matter**

We have determined that the microscopic hair comparison analysis testimony or laboratory report presented in this case included statements that exceeded the limits of science in one or more of the following ways and were, therefore, invalid: (1) the examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others – this type of testimony exceeded the limits of the science; (2) the examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive

---

The government identified nearly 3,000 cases in which FBI examiners may have submitted reports or testified in trials using microscopic hair analysis. As of March 2015, the FBI had reviewed approximately 500 cases. The majority of these cases were trials and the transcript of examiner testimony was reviewed. Some of these cases ended in guilty pleas, limiting the review to the original lab report. In the 268 cases where examiners provided testimony used to inculpate a defendant at trial, erroneous statements were made in 257 (96 percent) of the cases. Defendants in at least 35 of these cases received the death penalty and errors were identified in 33 (94 percent) of those cases. Nine of these defendants have already been executed and five died of other causes while on death row. The states with capital cases included Arizona, California, Florida, Indiana, Missouri, Ohio, Oklahoma, Pennsylvania, Tennessee, and Texas. It should be noted that this is an ongoing process and that the numbers referenced above will change.

The review has shown that the FBI examiners testified in cases in 41 states. *Id.* at A996 (Joint Statement at 3).

[59] *Id.* at A18 (2015 Letter at 2).

[60] *Id.* at A17–81 (2015 Letter).

24

association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association – this type of testimony exceeded the limits of the science; or (3) the examiner cites the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual – this type of testimony exceeded the limits of the science. (A copy of the documents upon which our determination is based, specifying which of the three error types were identified, is enclosed.) We take no position regarding the materiality of the error in this case.[61]

The 2015 Letter identified the following "Type 1" statements made by Podolak during Bass's trial (identified below in italics), each of which exceeded the limits of science because "(1) the examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others:"[62]

- "Now, my job then is to determine, first of all, whether there are any hairs present on the items which are submitted to me; and then secondly, *try to make an association between those hairs and the particular individual.*"[63]

- "The most important part of the hair comparison is the arrangement of the characteristics in association with one another. *Take the human face for an example. We all have eyes, nose, mouth, ears, hairline, chin, and so forth. And if you look from one individual to the other, you'll see that some of these characteristics are the same, from one individual to the next. But it's the arrangement of those characteristics on your face that gives you a uniqueness to you that when someone looks at you, they can say, "That's so and so." It's the same thing with hair. It's the arrangement of the characteristics that we have in association with each other that gives a uniqueness to the hair which then allows us to make an association of that hair to a particular individual.*"[64]

- "[Referring to the Minnesota Study] *Now, the conclusion then or what this all points out is that the morphology of human head hairs is an*

---

[61] *Id.* at A18 (2015 Letter at 2) (internal footnote omitted).

[62] *Id.*

[63] *Id.* at A28 (2015 Letter, A. Podolak Direct Test. at C56:9–13) (emphasis added).

[64] *Id.* at A34–35 (2015 Letter, A. Podolak Direct Test. at C62:12–C63:3) (emphasis added).

25

*individual characteristic of identity, and that they are – this affirms that this is a good reliability or a very good ability of an analyst to take a questioned hair and match it to an individual in a crime situation.*"[65]

- [Q: Aren't there, in fact, certain groups of people or certain types of hair that you could have two samples from the same head and they would not be microscopically similar?] A: "Oh, yes. *That's all part of the individual's identity or the uniqueness of the individual's hair.*"[66]

It further identified the following limiting language in Podolak's trial testimony:

- [Q: . . . On the basis of your examinations, you are not able to positively state that, in fact, they were from Alan Bass or [S.K.] or [A.S.]. Is that correct?]

- A: "That's correct. Hair comparisons are not like fingerprints; they are not a hundred percent accurate."

- [Q: In fact, you put a disclaimer in here that states, "It's pointed out that hair comparisons do not constitute a basis for absolute personal identification." Isn't that correct too?]

- A: "That's correct. I think the key word is 'absolute.'"[67]

- [Q: So as to each of your findings here, your finding is simply that the hairs you examined could have originated from either Mr. Bass or [A.S.] – [A.S.] or [S.K.]?]

- A: "That's correct. I cannot say with a hundred percent surety that they originated from those individuals."[68]

  . . . .

- [Q: [Referring to the substance of the testimony in the above-quoted passage] you also have a caveat in there, that it's pointed out that hair

---

[65] *Id.* at A78 (2015 Letter, A. Podolak Redirect Test. at C106:7–12) (emphasis added).

[66] *Id.* at A79–80 (2015 Letter, A. Podolak Redirect Test. at C107:23–C108:4–5) (emphasis added).

[67] *Id.* at A67 (2015 Letter, A. Podolak Cross-Examination Test. at C95:3–13).

[68] *Id.* at A71 (2015 Letter, A. Podolak Cross-Examination Test. at C99:10–16).

comparisons do not constitute a basis for absolute personal identification. What do you mean by those comments? Would you explain that?]

- A: "Yes. . . ."[69]

In the 2015 Letter, Mr. Wong recommended that A.G. Denn "promptly advise the appropriate victim advocate in your office of this error, so that he/she may determine how and when to inform the victim or the victim's family that this matter may be the subject of further litigation and that they may be contacted by the defense."[70]

Mr. Wong also stated that the FBI was available to provide mitochondrial DNA ("mtDNA") testing of the relevant hair evidence in the event that the Delaware DOJ determined that further testing was appropriate or necessary. He further described how the USDOJ was addressing the problem which included waiving reliance on statutes of limitations and procedural default defenses. He asked that he be advised if the Delaware DOJ planned to take any action based upon the information he provided. Finally, he advised that he was notifying the defense in Bass's case and was notifying the Innocence Project and the National Association of Criminal Defense Lawyers of the error.

### 5.    *The Seventh Postconviction Motion*

Following the USDOJ/FBI's disclosure, the Office of Conflicts Counsel assigned postconviction counsel to Bass. On April 26, 2018, Bass, through postconviction counsel, filed the Rule 61 motion before us — his seventh. In it, Bass asserted that the USDOJ/FBI's 2015 acknowledgment regarding the limitations of the MHC testimony

---

[69] *Id.* at A74 (2015 Letter, A. Podolak Redirect Test. at C102:19–C103:1).

[70] *Id.* at A18 (2015 Letter at 2).

constituted "new" evidence that creates a strong inference that he is actually innocent in fact of the acts underlying the charges of which he was convicted.[71] He asserted that without this improperly admitted testimony, the State's remaining evidence was insufficient to support a conviction. He also asserted that the State's use of this unreliable hair evidence violated his right to a fair trial.[72]

### 6. The Commissioner's Report

Bass's Rule 61 motion was referred to a Superior Court Commissioner pursuant to 10 *Del. C.* § 512(b) and Superior Court Criminal Rule 62(a)(5). During the pendency of the motion before the Commissioner, the parties became aware that the hair evidence was still available from Bass's 1983 trial. Before a scheduled evidentiary hearing, both sides stipulated to submit the hair evidence to the FBI for additional MHC analysis and mtDNA testing.[73]

Regarding the MHC analysis as to the S.K. sample, the results concluded that Bass was "a possible source of [the] hair."[74] Due to the limited nature of the A.S. sample, no conclusions could be reached as to whether or not Bass could be included as a possible source. Regarding the mtDNA testing, the FBI concluded that for S.K., Bass could not be excluded as a source. As for A.S., the samples were not able to be interpreted due to

---

[71] *Id.* at A868 (Motion for Postconviction Relief at 1).

[72] As noted above, Bass also asserted that the State's failure to dismiss his indictment violated his due process rights and demonstrated disparate treatment in view of the Delaware Attorney General's dismissal of an indictment in *State v. Daniels* based on invalid MHC evidence. *Id.* at A1010–58 (Supplemental Memorandum in Support of Postconviction Relief).

[73] *Commissioner's Report*, 2021 WL 5984262, at *3, *12.

[74] *Id.* at *13.

mixtures of mtDNA from more than one individual being present. The parties stipulated to the mtDNA results.

With the supplemental submission of the mtDNA results, the Commissioner issued her Commissioner's Report on December 15, 2021. The Commissioner found that the USDOJ/FBI's 2015 disclosure identifying erroneous testimony by FBI examiners, and the new understanding in forensic science regarding the limitations of MHC analysis for individual identification constitute new evidence for purposes of Rule 61's actual innocence exception.[75]

The Commissioner then inquired whether "considering the evidence introduced at trial other than what was later repudiated, there was a reasonable probability of a different outcome – that is, an acquittal."[76] Finding that there was not, the Commissioner noted that MHC is still an accepted and reliable scientific method of technique used by the FBI, Podolak's statements were limited during cross-examination, the MHC re-test did not exonerate Bass, the mtDNA testing further "corroborated the MHC analysis,"[77] and there was other evidence even without any MHC evidence to support Bass's convictions. This other evidence included testimony from each of the victims, testimony from two

---

[75] *Id.* at *14.

[76] *Id.*

[77] *Id.* at *15. The Commissioner's Report incorrectly stated that the "partial mtDNA sequence obtained from the S.K. sample matched Bass." *Id.* The Superior Court held that the Commissioner was incorrect to refer to the mtDNA testing as a "match" for Bass. *Super. Ct. Op.*, 2022 WL 2093956, at *10. The Superior Court found that no conclusions can be drawn from a finding that Bass cannot be excluded as a source and that mtDNA is not as conclusive as nuclear DNA testing. *Id.*; *see also* A1037 (Laboratory Report, dated Jan. 20, 2020, containing Results of Mitochondrial DNA Examinations).

29

eyewitnesses, testimony from Bass's long-time friend Loretta Schoell, the dictation machine found in her car, the repetitive conduct and common characteristics of the assailant, and the similarities in the *modus operandi* of the attacks — all of which linked Bass to the attacks.[78]

With respect to Bass's second constitutional claim, the Commissioner found that *Daniels* was inapposite because "where in the *Daniels* case every aspect of the State's evidence was called into question," "[n]othing in the record, and none of the recent retesting of the MHC evidence, has exonerated Bass in any way."[79] Accordingly, the Commissioner recommended that Bass's seventh motion for postconviction relief be denied.

---

[78] *Commissioner's Report*, 2021 WL 5984262, at *15–17. Specifically, the Commissioner concluded that "[t]here was strong direct and circumstantial evidence demonstrating Bass' guilt. Bass' trial would not have been different without Agent Podolak's inadmissible testimony overstating the MHC evidence in view of the substantial evidence of Bass' guilt, and the re-testing of the hair for a MHC comparison and mtDNA testing." *Id.* at *17.

[79] *Id.* at *19. Specifically, the Commissioner explained:

> In this case, with the exception of the overstatements of the MHC expert, all other aspects of the State's case against Bass remain in place. The re-test results of the MHC evidence do not exonerate Bass in any respect. There have been no new discoveries of any factual evidence that calls into question the verdict. No physical evidence has surfaced that undermines the State's case against Bass. The State's case against Bass through direct and circumstantial evidence was substantial and remains in place.

*Id.*

### 7. The Superior Court's Denial of Postconviction Relief

On January 26, 2022, Bass appealed the Commissioner's Report.[80] He argued that the Commissioner's Report (1) overstates the strength of the State's case, (2) minimizes the effect of Podolak's false testimony on the jury, (3) overstates the significance of the mtDNA evidence, and (4) improperly finds that the Rule 61 motion fails to overcome the procedural bar of Rule 61(d)(2).[81] The Superior Court rejected Bass's contentions, adopted the Commissioner's Report, and denied Bass's seventh postconviction motion.

In denying Bass's instant postconviction motion, the Superior Court concluded that the 2015 Letter was new evidence, but that it was not persuasive. It gave three reasons: (i) the new evidence does not carry the persuasive force so as to change the result of the trial and the expert's overstatements were effectively limited through cross-examination;[82] (ii) "the new evidence does not *establish* that someone other than Defendant committed these crimes;"[83] and (iii) the result would not change if the erroneous testimony were excluded entirely. It summarized its findings:

> The record is replete with challenges through cross examination regarding the inconsistences related to Defendant's identification and what the witnesses did and did not see. The jury was free to weigh the credibility of these witnesses and the inconsistencies of the evidence as to identification. The State established guilt independently as to each victim and further

---

[80] *See* App. to Opening Br. at A1268–1311 (Appeal From Commissioner's Findings of Fact and Recommendation, dated Jan. 26, 2022).

[81] *Super. Ct. Op.*, 2022 WL 2093956, at *7.

[82] The Superior Court found that "[t]he jury therefore heard that hair comparison analysis was neither one hundred percent accurate nor absolute for personal identification. Considered in its totality, the impropriety of the expert's testimony lacks the requisite force to impact the State's case against Defendant." *Id.* at *9.

[83] *Id.* at *10 (emphasis in original).

31

presented the similarities that connected the series of these assaults to Defendant. Challenges to any flaws in the identification processes are without merit and insufficient to disturb the jury's verdicts.[84]

Accordingly, the court concluded that, although the evidence was new and was neither cumulative nor impeaching under *Purnell v. State*,[85] it was not persuasive because the result probably will not change if a new trial were granted.[86] The Superior Court also rejected Bass's second constitutional challenge regarding the dismissal of the *Daniels* indictment, largely on the grounds that the circumstances in *Daniels* were different.[87] Bass does not appeal the *Daniels* holding.[88]

### C. Contentions on Appeal

We consider whether the Superior Court erred in denying Bass's seventh motion for postconviction relief.

#### 1. Bass's Contentions

Bass asserts that the Superior Court committed three distinct legal errors in denying his motion. *First*, he claims the court erred in finding that the MHC evidence at Bass's trial was "limited" and in finding that the new evidence was not persuasive according to the standard set forth in *Purnell*.[89] He argues that, although there was limiting language to

---

[84] *Id.* at *12.

[85] 254 A.3d 1053 (Del. 2021).

[86] *Super. Ct. Op.*, 2022 WL 2093956, at *10–11.

[87] *Id.* at *13–14.

[88] Moreover, Bass does not mention the holding in his opening brief, and therefore, any argument regarding *Daniels* is waived. Supr. Ct. R. 14(b)(vi)(A)(3).

[89] Opening Br. at 36, 40.

the effect that "hair comparisons are not like fingerprints" and are not 100% accurate[90] and that Podolak could not say with absolute certainty that the hair came from Bass, or even A.S. or S.K., during cross-examination, "the problems began on redirect examination."[91] Bass points to Podolak's statements on redirect examination, where Podolak testified that: (i) he is more adept at identifying and comparing "negroid hairs" than "caucasian or mongoloid hairs;"[92] (ii) although defense attorneys have disputed FBI examiners' testimony for years because of lack of statistics, there was a study (*i.e.*, the Minnesota Study) wherein an examiner used the FBI technique used by Podolak and determined a match 100% of the time;[93] and (iii) he had performed over 3,000 microscopic hair comparisons and had yet to find any hair from two different individuals where he could not distinguish between their hair characteristics.

Bass argues that any limiting language that may have cured the error during cross-examination was nullified by Podolak's testimony on redirect. The minimal recross, in which Podolak testified that he "agreed that two hairs from the same head might not be microscopically similar," was insufficient to overcome the damage caused by Podolak's testimony during redirect examination.[94]

---

[90] *Id.* at 37 (quoting App. to Opening Br. at A67 (A. Podolak Cross-Examination Test. at C95:6–7)).

[91] *Id.* at 38. Bass submits that "had the questioning stopped there, the testimony would have been sufficiently limited, and the Superior Court would be correct." *Id.* at 38.

[92] App. to Opening Br. at A73 (A. Podolak Redirect Test. at C101:12–15).

[93] *Id.* at A78 (A. Podolak Redirect Test. at C106:3–7).

[94] *Id.* at A80 (A. Podolak Redirect Test. at C108:1–7).

*Second*, Bass contends that the Superior Court erred in holding that the result of his trial would not change if there had been no microscopic hair evidence. He argues that "[t]he crucial issue at trial was identification,"[95] and that identity was established through Podolak's overstated testimony, and not sufficiently established by the remainder of the evidence.[96] He argues that "[e]very identification in the case was weak, contradictory, or induced by police or [Delaware] DOJ personnel."[97]

In support of this claim, Bass points out that each witness had a limited amount of time to view the attacker. He underscores that S.K. never identified her attacker before trial, in spite of the fact that she underwent hypnosis, viewed several photo lineups, and a live lineup (in which she chose a Wilmington police officer). He suggests that her in-court identification was flawed because the Delaware DOJ had told her that they had evidence to believe the defendant, who would be sitting at one of the tables in front, was her attacker.

Bass argues that the identification was weak in A.S.'s case as well. A.S. never positively identified Bass in court, instead saying that Bass resembled her attacker.[98] She also did not identify Bass's shoes as the ones she saw on her attacker during the assault, instead saying they were the right color but a different material.

Finally, as to S.M., he notes that S.M. never identified Bass, and the identifications from the State's two eyewitnesses were flawed for several reasons. First, the only

---

[95] Opening Br. at 41.

[96] *Id.*

[97] *Id.* at 43.

[98] App. to Opening Br. at A249 (A.S. Trial Test. at 143:7–8).

eyewitness to positively identify Bass was Ms. Shaw, and her photo identification was weak, and her in-court identification was tainted because of the detective's disclosure to her after she identified Bass in the photo lineup that Bass was the defendant. Second, the photo lineup identification of the second witness, Mr. Reynolds, was questionable because Mr. Reynolds only had a brief, obstructed view of the perpetrator.

*Third*, Bass contends that the trial court misread this Court's holding in *Purnell*, and, as a result, it erred in holding that he was required to show that another individual committed the crimes for which Bass was convicted. He argues that a petitioner alleging actual innocence need not *establish* that someone other than the defendant committed the crime.

*Lastly*, Bass argues that he has met his heavy burden of establishing entitlement to relief under Rule 61(d)(2) because he has met all three prongs of the test we set forth in *Purnell*. Since the Superior Court held that Bass met two of the prongs — the evidence is "new" and not "merely cumulative or impeaching" — Bass focuses on the third prong, namely, whether the outcome of the trial will probably change because of the new evidence. Bass argues that without Podolak's testimony, "[t]he remaining evidence of identification was weak and did not amount to proof beyond a reasonable doubt." Further, the overstatements in Podolak's testimony were not cured by limiting statements. And, according to Bass, Podolak's testimony on redirect that he had never been wrong in over 3,000 tries, and his reference to the Minnesota Study testimony, overpowered any limiting statements. Therefore, he contends that the result of the trial will probably change if the MHC evidence were excluded.

### 2. *The State's Response*

*First*, the State argues that the Superior Court was correct in finding that the USDOJ/FBI admissions constitute "new" evidence that is not merely cumulative or impeaching and that Podolak's testimony contained sufficient limiting statements. It points out that this Court confronted the same issue on direct appeal when Bass challenged the introduction of the Minnesota Study and decided that its introduction was not fundamental because Podolak had made concessions that MHCs were not faultless. *Second*, the State argues that Bass has not shown that a person other than Bass committed the attacks, and that the correct reading of *Purnell* is that "the new evidence must show that someone other than the movant committed the crime, not specifically identify that other person."[99] *Third*, the State argues that even if the MHC testimony had not been admitted, the outcome of the trial would not have changed. *Finally*, the State argues that even if this Court were to reach Bass's underlying due process claim, that claim is meritless.[100]

### 3. *Areas of Agreement*

At the outset we note that the parties agree that the standard we set forth in *Purnell* applies to our resolution of this appeal, and that under *Purnell*, the USDOJ revelations about MHC evidence are "new."

---

[99] Answering Br. at 35.

[100] *Id.* at 52–53 (quoting *Swan v. State*, 248 A.3d 839, 878 (Del. 2021) (due process violated where State knowingly uses false testimony and if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury")).

36

As to the first point, Bass correctly notes that the USDOJ waived all procedural defenses and statutes of limitations in cases with identified MHC errors. He also notes that courts in Massachusetts[101] and Pennsylvania,[102] as well as federal courts hearing *habeas* petitions, have waived defenses and procedural bars in such cases. Further, certain state legislatures have acted to eliminate procedural bars for petitioners whose convictions are potentially tainted by scientific evidence later discovered to be flawed. There is no doubt that the revelations regarding MHC expert testimony are extremely troubling. Close scrutiny of these cases is required. We look to the facts of each case and the new evidence to determine whether the pleadings carry the heavy burden set forth in *Purnell*.[103]

---

[101] *Commonwealth of Massachusetts v. Perrot*, 2016 WL 380123 (Mass. Super. Ct. Jan. 26, 2016).

[102] *Commonwealth v. Chmiel*, 240 A.3d 564, 569 (Pa. 2020).

[103] An exchange at oral argument suggests that the number of any other such cases in Delaware may be very limited:

> The Court: Are you able to tell us, one last question on this, if you're comfortable and able, are there a substantial number of these cases still working their way through the Delaware Justice system?
>
> Counsel: We found five, Your Honor. We found five, and I think I handled them all. And, there was the *Crump* case, I moved to withdraw. I recall two others in which I moved to withdraw because the issue wasn't whether the hair examiner, in other words, the defense was that the sexual intercourse was consensual, not an identity case, so those didn't go anywhere. This is the only case that has actually resulted in a substantive motion for postconviction relief. I am not aware of any other cases, Your Honor, there could be, I just don't know.

Oral Argument at 9:07–10:00, *Bass v. State*, No. 218, 2022, *available at* https://livestream.com/delawaresupremecourt/events/10806463/videos/235883011 [hereinafter Oral Argument]; *see also* A1001C (Letter to Commission Requesting to Supplement the Record, dated Dec. 10, 2018). In *State v. Crump*, for example, we affirmed the Superior Court's denial of the defendant, Crump's, successive Rule 61 motion after the USDOJ/FBI informed defendant that the FBI's hair and fiber expert had committed errors in his testimony at the defendant's trial. 2017 WL 6403510, at *1–2 (Del. Super. Dec. 14, 2017), *aff'd*, *Crump v. State*, 194 A.3d 16, 2018 WL 3769261, at *1 (Del. Aug. 7, 2018), *cert. denied*, *Crump v. Delaware*, 139 S. Ct. 1400 (2019)

As discussed above, Rule 61(i)(2) prohibits this Court from considering a second or successive motion for postconviction relief unless the defendant can meet one of the exceptions laid out in Rule 61(2)(i) or (ii).[104] We are bound by this Rule unless and until we amend our Rules or unless and until the Delaware General Assembly creates an exception to procedural bars for defendants challenging their convictions due to improper MHC evidence. Here, the Superior Court determined that it "need not consider the applicability of other jurisdictions actual/factual innocence tests since Delaware's requirements are fully set out under *Purnell* and where [Bass] later tailored his arguments in this appeal under this applicable rubric."[105] At oral argument before this Court, Bass agreed that the standard set forth in *Purnell* applies.[106]

---

(mem.). In that case, new DNA testing positively identified the defendant as the contributor of DNA found on the victim's pubic comb. *See Crump*, 2017 WL 6403510, at *2.

[104] Super. Ct. Crim. R. 61 ("A second or subsequent motion under this rule shall be summarily dismissed, unless the movant was convicted after a trial and the motion . . . pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted . . . .").

[105] *Super. Ct. Op.*, 2022 WL 2093956, at *8 n.132.

[106] Bass's counsel stated that its references to other state's legislative changes regarding procedural bars were illustrative only:

> The Court: You have five pages in your opening brief where you talk about what other jurisdictions have done regarding these situations, but then you come back to the *Purnell* case. It's your position, I take it, that our standard of *Purnell* is what governs here.

> Counsel: I mean to be illustrative of other jurisdictions who have been proactive about this issue. The United States Department of Justice has waived all procedural defenses. The American Bar Association has encouraged all jurisdictions to do so. States have passed legislation regarding change or newly discovered science, flaws in prior science. I am making the argument based on this Court's holding in *Purnell*.

Oral Argument at 17:15–17:59.

As to the "newness" point, we agree with the Commissioner and with the Superior Court that the revelations about MHC uncovered by the USDOJ/FBI report constitute "new" evidence such that Bass has satisfied the newness prong of the actual innocence exception. The State does not disagree. Evidence is new "where it was 'discovered since trial, and the circumstances must be such as to indicate that it could not have been discovered before trial with due diligence.'"[107] Here, the Joint Statement was made public in 2015, decades after Bass's trial.

### III.   Standard of Review

This Court reviews a trial court's denial of a motion for postconviction relief for abuse of discretion.[108] "Nevertheless, we carefully review the record to determine whether 'competent evidence supports the court's findings of fact.'"[109] We review legal or constitutional questions *de novo*.[110]

### IV.   Analysis

#### A.   The Applicable Standard for Actual Innocence Postconviction Claims

Superior Court Criminal Rule 61 governs motions for postconviction relief in Delaware.[111] Since the instant motion for postconviction relief was filed on April 26, 2018,

---

[107] *Purnell*, 254 A.3d at 1097 (quoting *Lloyd v. State*, 534 A.2d 1262, 1267 (Del. 1987)).

[108] *Swan*, 248 A.3d at 855.

[109] *Neal v. State*, 80 A.3d 935, 941 (Del. 2013) (quoting *Zebroski v. State*, 822 A.2d 1038, 1043 (Del. 2003), *impliedly overruled on other grounds as recognized in Steckel v. State*, 882 A.2d 168, 171 (Del. 2005)).

[110] *Green v. State*, 238 A.3d 160, 173 (Del. 2020).

[111] Super. Ct. Crim. R. 61.

39

the current version of Rule 61, with the 2014 amendments, applies.[112] The current version

of Rule 61(d)(2) precludes Delaware courts from hearing any second or subsequent motion

for postconviction relief, "unless the movant was convicted after a trial" and the motion

meets one of two statutory exceptions.[113] Because this is Bass's seventh motion for

postconviction relief, he must meet one of the exceptions before a court can reach the merits

of his underlying constitutional claims.

Under Rule 61(d)(2)(i), an untimely postconviction motion is allowed if it "pleads

with particularity that new evidence exists that creates a strong inference that the movant

is actually innocent in fact of the acts underlying the charges of which he was convicted."[114]

This first prong is referred to in our jurisprudence as the "actual innocence exception."

Bass claims relief from Rule 61 under the actual innocence exception. A movant can only

prevail on the merits if the motion satisfies the foregoing pleading requirements.

Moreover, "[i]nnocence of the 'acts underlying the charges' requires 'more than innocence

---

[112] *See Purnell*, 254 A.3d at 1094 ("This Court repeatedly has held that a motion for postconviction relief is to be adjudicated in accordance with Rule 61 as it exists at the time the motion is filed.") (citing *Bradley v. State*, 135 A.3d 748, 757 n.24 (Del. 2016); *Brochu v. State*, 133 A.3d 558, 2016 WL 690650, at *4 n.24 (Del. Feb. 19, 2016) (TABLE); *Starling v. State*, 130 A.3d 316, 332 n.95 (Del. 2015)).

[113] Super. Ct. Crim. R. 61(d)(2).

[114] *Id.* 61(d)(2)(i). Under Rule 61(d)(2)(ii), an untimely postconviction motion is also allowed if it "pleads with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid." *Id.* 61(d)(2)(ii). This exception is not implicated here.

of intent; it requires new evidence that a person other than the petitioner committed the crime.'"[115]

We most recently examined the actual innocence exception to the procedural bar of Rule 61(d) in *Purnell*. There, we clarified the standard for actual innocence, including "when evidence is 'new'" and "what showing creates a 'strong inference' of innocence:"

> To qualify for an exception to Rule 61's procedural bars against untimely, successive motions, [a defendant] must identify with particularity new evidence that creates a strong inference that he is actually innocent in fact of the acts underlying the charges. Stated differently, [a defendant] must present additional evidence that was not available at trial and would not have been despite his exercise of due diligence. [The defendant] must also convince us that the new evidence, when considered in the context of all the relevant evidence by a properly instructed jury, is such as will probably change the result if a new trial were granted.[116]

We observed that "[s]atisfying the actual innocence test is, by design, a heavy burden, and such meritorious claims are exceedingly rare."[117] We found that the defendant, Mark Purnell ("Purnell"), qualified for the actual innocence exception to Rule 61's procedural bar.[118] It was the first time this Court had found a defendant eligible for such relief.

Purnell's case consists of the following extraordinary facts. In January 2006, two

---

[115] *Purnell*, 254 A.3d at 1095 (quoting *State v. Taylor*, 2018 WL 3199537, at *7 (Del. Super. June 28, 2018), *aff'd*, 206 A.3d 825, 2019 WL 990718 (Del. Feb. 27, 2019) (TABLE)).

[116] *Id.* at 1060. In doing so, we affirmed the test substantively articulated in *Lloyd v. State* and applicable to federal *habeas corpus* cases per *Schlup v. Delo*, 513 U.S. 298 (1995).

[117] *Purnell*, 254 A.3d at 1100.

[118] *Id.* at 1060. By the time we heard Purnell's claim, Purnell had spent fourteen years of his life in prison. Instead of remanding Purnell's case to the Superior Court to hold an evidentiary hearing based on our guidance on the standard for actual innocence, we ordered a new trial. *Id.*

41

armed assailants shot and killed Tameka Giles in Wilmington after a botched robbery attempt. At the time, an eyewitness and Mrs. Giles's husband, who was with her at the time of the murder, identified Ronald Harris and Kellee Mitchell, respectively, as the assailants. Later, when searching Kellee Mitchell's apartment, police found a .38-caliber revolver hidden in the ceiling tiles outside of the apartment. Ronald Harris's brother, Dawan Harris, who Ronald strongly resembled, was in the apartment at the time. Dawan Harris admitted the gun belonged to both Mitchell and him. With the assistance of court-appointed counsel, Dawan Harris pled guilty to a weapons charge for possession of the revolver. He was a suspect in the Giles murder initially. Two different witnesses had implicated him.

A year later, in January 2007, an individual named Corey Hammond was arrested on drug charges. He implicated Purnell in the Giles murder. Later that month, Kellee Mitchell, also one of the original suspects, implicated Purnell in the murder. Purnell and his alleged accomplice, Ronald Harris, were arrested and charged.

The Superior Court appointed Purnell an attorney to defend him at the murder trial. Purnell's court-appointed attorney was the same one who had represented Dawan Harris in the Possession of a Deadly Weapon by Persons Prohibited ("PDWBPP") charge resulting from his possession of the .38-caliber revolver. Before trial, Purnell's trial counsel brought the conflict of interest to the trial judge's and the State's attention, including the defense theory that Dawan Harris might by the true killer.[119] The trial judge

---

[119] As our opinion in *Purnell* explained:

denied trial counsel's motion to withdraw, ordering him to proceed as Purnell's trial advocate.

In April 2008, a Superior Court jury convicted Purnell of Murder Second Degree and other related charges.[120] The evidence presented to the jury consisted of: (1) claims made by Corey Hammond regarding claims Purnell and Ronald Harris made around the time of the murder, (2) claims made by Kellee Mitchell, that Purnell had bragged about having committed the murder, and (3) the testimony of Ronald Harris, who agreed to testify as part of a plea deal wherein prosecutors would drop his pending murder and weapons charges and recommend a sentence of three years. This Court affirmed Purnell's conviction on his direct appeal wherein he did not raise the conflict of interest issue.

After his conviction and direct appeal, Purnell filed a 133-page handwritten *pro se* Rule 61 motion "raising ten grounds for relief, of which the first was an objection to his trial counsel's conflict of interest."[121] Yet, "[a]fter he obtained representation,

---

Trial Counsel noted that the defense had multiple theories involving Dawan. One was the belief that Mitchell and Dawan were the true robbers, with the eyewitness misidentifying Dawan as Ronald. Another was that the robbers were Ronald Harris and either Mitchell or Dawan, and that Ronald was falsely implicating Purnell as the accomplice in retaliation for Purnell 'snitch[ing]' on them for shooting this .38-caliber out of a window in Compton Towers that prompted them getting in trouble. However, presenting those theories would require Trial Counsel to take positions directly adverse to Dawan's interests in the Giles investigation, painting him as the murderer directly, or asserting that the weapon Dawan had pleaded guilty to possessing was the murder weapon. But Trial Counsel was ethically precluded from doing so, and hence from advancing these potential defensive strategies.

*Id.* at 1109.

[120] *Id.* Purnell was convicted of Murder Second Degree, Attempted Robbery First Degree, Conspiracy Second Degree, PDWBPP, and two counts of PDWDCF. *Id.* at 1087.

[121] *Id.* at 1059. In his second motion for postconviction relief, Purnell claimed that the omission of the conflict issue was error, but in another extraordinary occurrence, Purnell's first

43

postconviction counsel filed an amended motion asserting only three grounds and did not include the conflict claim."[122]  The Superior Court denied Purnell's amended Rule 61 motion.  This Court affirmed the denial of relief.

Then, in May 2018, Purnell filed a second postconviction motion alleging 10 grounds for relief.  His first ground for relief was that he was actually innocent, and his second was that his trial counsel was conflicted due to his prior representation of Dawan Harris, prejudicing Purnell's case and denying him effective assistance of counsel.  Several grounds asserted that trial counsel was ineffective for failing to develop exculpatory evidence at trial, including evidence implicating Dawan Harris.  Other grounds related to evidence that Kellee Mitchell's, Corey Hammond's, and Ronald Harris's statements were unreliable and coerced, and to evidence that Purnell lacked the physical mobility at the time to commit the crime.  In sum, Purnell's claim of actual innocence was based on a theory that his trial counsel was conflicted, and because trial counsel was denied permission to withdraw, Purnell was unable to pursue a defense theory that two other people, including his counsel's prior client, actually committed the murder.

### 1.    The "Newness" Requirement

In *Purnell*, we explained that, to qualify for Rule 61's actual innocence exception, "[a defendant] must present additional evidence that was not available at trial and would

---

postconviction counsel died before oral argument on the first motion.  Thus, we could never know why counsel chose to exclude Purnell's conflict of interest claim as a basis for postconviction relief.  Accordingly, and unfortunately, this Court did not hear about the conflict of interest that tainted Purnell's trial until his second motion for postconviction relief was filed, 14 years after Purnell's incarceration.

[122] *Id.* at 1059–60.

44

not have been despite [the defendant's] exercise of due diligence."[123]  There, the Superior

Court had found that Purnell could not meet this burden because "almost all of the evidence

Purnell submits could have been obtained by a rigorous investigation prior to trial by

unconflicted counsel."[124]  We held the trial court erred in its conclusion because "the

relevant inquiry is whether [*the defendant*] could have obtained and presented the evidence

of his innocence at trial with the exercise of due diligence."[125]  Because Purnell's trial

counsel was conflicted and the trial court had refused to let Purnell's trial counsel

withdraw, Purnell was barred from accessing the evidence he presented as the basis for his

second Rule 61 postconviction motion.[126]

Therefore, we found that the evidence submitted by Purnell — particularly evidence

that implicated Dawan Harris, Purnell's trial counsel's former client — was "new" within

the meaning of the actual innocence exception because Purnell himself would not have

been able to discover it through the exercise of due diligence.[127]  Moreover, we found that

"[s]ince much of [Purnell's] evidence goes to proving facts incompatible with his guilt, it

---

[123] *Id.* at 1060.

[124] *Id.* at 1100.

[125] *Id.* (emphasis added).

[126] *Id.* at 1100, 1113.  We found that Purnell did not waive the conflict at the time of trial.  *Id.* at 1101.

[127] *Id.* at 1100.  We found that "[m]uch of the evidence Purnell presents, though knowable or even known at the time, was unavailable *to him* at trial because his counsel was not permitted to withdraw and was precluded from obtaining or presenting it due to his ethical duties to his former client."  *Id.* at 1060 (emphasis in original).

also satisfies the requirement that [evidence] goes beyond being merely cumulative or impeaching."[128]

### 2. The "Persuasiveness" Requirement

As to the second prong of the actual innocence inquiry, we explained in *Purnell* that the defendant must "convince us that the new evidence, when considered in the context of all the relevant evidence by a properly instructed jury, is such as will probably change the result if a new trial were granted."[129] "[T]he court must assess *all* of the evidence, including that which was properly excluded and that which was wrongfully admitted."[130]

Purnell presented a significant amount of new evidence in his second Rule 61 motion, which we divided into six categories: (1) ballistic and firearm evidence undermining the only physical evidence tying Purnell to the crime;[131] (2) Kellee Mitchell's

---

[128] *Id.* at 1113.

[129] *Id.* at 1060, 1100.

[130] *Id.* at 1113 (emphasis in original); *see also Schlup*, 513 U.S. at 327–28 ("[T]he emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. . . [it] must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.").

[131] Purnell presented expert testimony that the spent 9mm shell casing (found 40 to 50 feet from where the shooting occurred) could not have been ejected from the murder site since spent casings could not be ejected that far. This spent casing was the only physical evidence presented in Purnell's trial. Purnell argued that the new ballistic evidence demonstrated that the murder weapon was likely a revolver (which does not expend shell casings at all), potentially the revolver which Kellee Mitchell and Dawan Harris (Purnell's trial counsel's former client) were charged with unlawfully possessing. *Purnell*, 254 A.3d at 1114.

46

recantation of testimony that was heavily relied on by the State at trial;[132] (3) other evidence inculpating Dawan Harris and Kellee Mitchell; (4) evidence undermining Ronald Harris's testimony;[133] (5) evidence undermining Corey Hammond's testimony;[134] and (6) medical evidence of Purnell's physical incapacity.[135]

We concluded that much of the new evidence went to proving facts incompatible with Purnell's guilt, and satisfied the requirement that it went beyond being merely cumulative or impeaching. Thus, the key factor in Purnell's case was that "[t]rial [c]ounsel's actual conflict prevented him from investigating, developing and presenting any evidence that implicated Dawan Harris, his former client."[136] In other words, trial counsel was not allowed to explore the potential of Dawan Harris or Kellee Mitchell as possible perpetrators in any way: there was no pre-trial investigation and no cross-examination at trial. For example, Purnell's trial counsel could not present evidence that it was a revolver, not a semi-automatic gun that Purnell was accused of possessing, that

---

[132] Mitchell denied the truth and voluntariness of his prior statement. There was also new testimony indicating that Mitchell and Dawan Harris were in possession of the potential murder weapon prior to the murder, a fact contradicting Mitchell's prior testimony. *Id.* at 1116.

[133] We found that the new evidence — sworn statements from Ronald Harris's (Purnell's alleged co-defendant) mother and step-father indicating that Ronald Harris consistently maintained his innocence, which contradicted Ronald Harris's trial testimony — was merely impeaching. *Id.* at 1116–17.

[134] The evidence indicated that Hammond was a career criminal, testifying to avoid jail time. We found this evidence to be merely impeaching. *Id.* at 1117–18.

[135] Another extraordinary fact in Purnell's case is that he had undergone knee surgery eight days before the crime was allegedly committed, after he had accidentally shot himself. A medical expert submitted his opinion that Purnell would have been unable to run at the time of the crime, a fact established by an eyewitness who testified that the two killers sprinted away after shooting Mrs. Giles. *Id.* at 1119.

[136] *Id.* at 1108.

killed Mrs. Giles, because trial counsel had defended Dawan Harris in his prosecution for possession of a revolver. Relatedly, the exculpating evidence from Mitchell's recantation went to possession of the murder weapon. This too was evidence that Purnell's trial counsel was precluded from pursuing given his prior representation of Dawan Harris.

Evaluating Purnell's persuasive new evidence in light of trial counsel's conflict, and the highly unusual procedural circumstances which prevented Purnell's raising the issue earlier, we concluded: "Taken as a whole, and based on the State's own description of its case from its opening statement and closing argument at trial, the evidence Purnell presents is the rare case that overcomes the daunting burden of showing that it would probably change the result if a new trial were granted."[137] We noted further that the statements on which the State relied almost exclusively at trial already suffered from credibility problems,[138] and the facts surrounding the jury verdict indicated that "[t]he State's case, in other words, was a close one even when Purnell's defense was constrained by a severe ethical conflict which his trial counsel had noted and raised."[139]

In light of this conclusion, and the fact that Purnell had already spent approximately half of his life in prison following "a manifestly unfair trial," we reversed Purnell's conviction, and remanded for a new trial, instead of an evidentiary hearing.[140] The new trial never occurred. In yet another extraordinary occurrence, approximately nine months

---

[137] *Id.* at 1120.

[138] *Id.*

[139] *Id.* at 1122 (internal footnote omitted).

[140] *Id.* at 1060.

after we issued our opinion, the State, through a Deputy Attorney General, filed a notice of nolle prosequi with the Superior Court, ending its pursuit of a new trial in the "interest of justice."[141]

The notice disclosed that during the State's renewed review of the original police file from 2006-2008, "prosecutors identified potentially exculpatory evidence that may not have been provided to [Purnell] in the first trial."[142] Specifically, it referred to a witness interview taken in June of 2006, during the original investigation wherein the witness "claimed to have overheard a conversation in which another individual [not Purnell] discussed shooting Ms. Giles."[143] The State lacked "any documentation indicating the interview was ever turned over to [Purnell] during the first trial in 2008."[144] It further noted that "[i]f [the State] cannot show that an interview where another person was overheard discussing shooting a victim was provided to the defense in the initial trial, it raises sufficient questions that we cannot ethically proceed in the instant case."[145] Accordingly, "[a]fter careful consideration of all the evidence in the case, the State has determined it can no longer ethically proceed."[146]

---

[141] *State v. Purnell*, I.D. Nos: 0701018040, State's Notice of Nolle Prosequi, at ¶ 8 (Del. Super. Apr. 28, 2022).

[142] *Id.* at ¶ 3. The State lacked any documentation of an exculpatory interview being turned over to Purnell.

[143] *Id.* at ¶ 4.

[144] *Id*.

[145] *Id*.

[146] *Id.* at ¶ 6. The State acknowledged the exculpatory nature of the 2006 interview and stated that it "will only proceed to trial in matters it believes there is a reasonable likelihood of conviction." *Id*.

### B. *Whether the Superior Court Erred in Denying Relief*

With the high standard we articulated in *Purnell* in mind, we now turn to Bass's claim for relief. For the reasons set forth below, we conclude that Bass has not met his heavy burden of "pleading with particularity new evidence that creates a strong inference that he is actually innocent in fact of the acts underlying the charges of which he was convicted."[147]

#### 1. *Whether the Superior Court Erred in Finding the MHC Evidence was "Limited"*

Although the Superior Court agreed with Bass that the Joint Statement and USDOJ/FBI disclosures constitute new evidence, it held that "[c]onsidered in its totality, the impropriety of the expert's testimony lacks the requisite force to impact the State's case against [Bass]."[148] This is because Podolak acknowledged at trial that MHC is "not like fingerprints; they are not a hundred percent accurate" and is not a basis for "absolute personal identification," stating "the key word is 'absolute.'"[149] Further, Podolak acknowledged that he could not say with "a hundred percent surety" whether the hairs originated from the sexually assaulted victims (A.S. or S.K.) or from Bass.[150] And Bass's "trial counsel effectively cross-examined him regarding these limitations and properly elicited inconsistencies in his testimony."[151]

---

[147] *Purnell*, 254 A.3d at 1122.

[148] *Super. Ct. Op.*, 2022 WL 2093956, at *9.

[149] *Id.*

[150] *Id.*

[151] *Id.*

However, Bass argues that the problems with Podolak's testimony came on redirect examination. He concedes that up until that point, Podolak's testimony had been sufficiently limited on cross-examination.[152] Bass cites three statements made by Podolak on redirect that undermine the limiting language elicited during cross-examination.

First, Podolak testified that he is better at identifying and comparing "negroid hairs" than other types. Second, Podolak discussed the Minnesota Study and submitted it into evidence. Third, Podolak stated that out of 3,000 MHC reports, he had yet to find any hair from two different individuals "that I cannot distinguish between their hair characteristics."[153]

Of these statements, only the statements regarding the Minnesota Study were flagged by the 2015 Letter as "exceeding the limits of science." However, we view the statements regarding Podolak's impressive track record as being in the same vein as the Minnesota Study statements, and in any event, we consider the unflagged statements as well for completeness. We observe that on recross, Bass's counsel elicited testimony that "you could have two samples from the same head and they would not be microscopically similar."[154] This recross testimony limited, at least to some extent, the two statements raised by Bass on appeal but not flagged by the 2015 Letter.

As for the testimony regarding the Minnesota Study, Podolak stated that:

---

[152] Bass acknowledges "[h]ad the questioning stopped there, the testimony would have been sufficiently limited, and the Superior Court would be correct. But the problems began on redirect examination." Opening Br. at 38.

[153] *Id.* at 39 (quoting App. to Opening Br. at A78 (A. Podolak Redirect Test. at C106:21–22)).

[154] App. to Opening Br. at A512 (A. Podolak Recross Test. at C108:1–7).

51

[Referring to the Minnesota Study] Now, the conclusion then or what this all points out is that the morphology of human head hairs *is an individual characteristic of identity*, and that they are – *this affirms that this is a good reliability or a very good ability of an analyst to take a questioned hair and match it to an individual in a crime situation*.[155]

Bass's challenge to these statements is a refrain of his argument on direct appeal, wherein he argued that the admission of the study and the testimony constituted reversible error. We reviewed the Superior Court's denial of Bass's claim then, and we affirmed. We found no reversible error because Podolak did not rely on the study and his statements about its conclusions had been sufficiently limited.[156] We are not persuaded to depart from that ruling. But even if we were, Bass's claim fails because even considering the new evidence, which prompts us to assess the strength of his case without Podolak's improper testimony, the result of the trial will probably be the same.[157] We address this argument in Section 3 below.

2.        *Whether the Superior Court Erred in Holding that Bass Was Required to Establish Another Person Committed the Crimes*

The Superior Court did not err in holding that Bass was required to establish another person committed the crimes. In *Purnell*, we stated "[i]nnocence of the 'acts underlying the charges' requires 'more than innocence of intent; it requires new evidence that a person

---

[155] *Id.* at A78 (2015 Letter, A. Podolak Redirect Test. at C106:7–12) (emphasis added).

[156] *Id.* at A703–04 (Denial of Direct Appeal at ¶ 8–9).

[157] We observe that the Commissioner carefully examined the facts without reference to the MHC testimony in part of her analysis. *See Commissioner's Report*, 2021 WL 5984262, at *3 (stating that "[s]ince the issue presented herein is how material to Bass' conviction was the error of the MHC evidence, the facts as set forth below in this section will not reference the MHC evidence in any respect").

other than the petitioner committed the crime.'"[158]  Bass argues that the Superior Court misread *Purnell* and improperly imposed "a requirement that Mr. Bass produce a different individual who committed these offenses."[159]  He contends that *Purnell*, and the Superior Court's decision in *Taylor*, stand for the more limited proposition that a defendant cannot qualify for the actual innocence exception to Rule 61 if the new evidence is only probative of the defendant's lack of requisite intent to commit the crime of conviction.[160]

We do not believe the Superior Court construed *Purnell* to require a defendant to establish the actual perpetrator of the crime.  Rather, the Superior Court's conclusion that Bass's new evidence is not probative of his "actual innocence" is consistent with our statement in *Purnell* and the Superior Court's statement in *Taylor*, which we affirmed.[161]  In *Taylor*, the defendant sought relief under the actual innocence exception of Rule 61 where his new evidence consisted of two forensic reports opining that Taylor lacked the requisite intent to be guilty of first-degree murder.  The Superior Court in *Taylor* noted that whether new evidence probative of a lack of intent can satisfy the procedural bar of Rule 61 was a matter of first impression.  It turned to the Tenth Circuit's decision in *Long v.*

---

[158] 254 A.3d at 1095 (quoting *Taylor*, 2018 WL 3199537, at *7).

[159] Opening Br. at 45.

[160] *Id.* at 44.

[161] As we noted earlier, our statement in *Purnell* — "[i]nnocence of the 'acts underlying the charges' requires 'more than innocence of intent; it requires new evidence that a person other than the petitioner committed the crime'" — is drawn from *Taylor*.  *Purnell*, 254 A.3d at 1095 (quoting *Taylor*, 2018 WL 3199537, at *7).  The Superior Court cites to both *Purnell* and *Taylor* in this portion of tis opinion.  *See Super. Ct. Op*., 2022 WL 2093956, at *9 n.146.

*Peterson*[162] and the United States Supreme Court decision in *Sawyer v. Whitley*.[163]  In *Long*, the Tenth Circuit held that "actual innocence means factual innocence, not legal innocence."[164]  And in *Sawyer*, the Supreme Court noted:

> A prototypical example of "actual innocence" in a colloquial sense is the case where the State has convicted the wrong person of the crime.  Such claims are of course regularly made on motions for new trial after conviction in both state and federal courts, and quite regularly denied because the evidence adduced in support of them fails to meet the rigorous standards for granting such motions. But in rare instances it may turn out later, for example, that another person has credibly confessed to the crime, and it is evident that the law has made a mistake.[165]

*Purnell* was the "prototypical example" of "actual innocence" because he put forth evidence that the State had convicted the wrong person of the crime.  In *Purnell*, the evidence pointed to other individuals as potential suspects, and we allowed the successive postconviction motion to move forward because Purnell presented evidence to that effect, which previously was unobtainable by him due to trial counsel's actual conflict of interest. This does not mean that in every case a defendant must present to the court another individual who could have committed the crime; rather, the defendant needs to put forth evidence probative of the fact that *the defendant* did not commit the crime, *i.e.*, factual innocence.

---

[162] 291 F. App'x 209 (10th Cir. 2008).

[163] 505 U.S. 333 (1992).

[164] 291 F. App'x at 213.

[165] *Sawyer*, 505 U.S. at 340–41.

Moreover, the Superior Court did not deny Bass's claim because Bass failed to produce a specific individual who committed the crime. Instead, it emphasized that Bass's new evidence does not establish any fact that might exculpate him. As the Superior Court put it: "the new evidence does not exonerate [Bass]."[166] And in this case, as discussed below, it does not convince us that when it is considered in the context of all relevant evidence by a properly instructed jury, it is such as will probably change the result if a new trial were granted.

### 3. Whether Bass Met His Heavy Burden of Establishing That the New Evidence is Persuasive

Both the Commissioner and the Superior Court found that the MHC evidence was "new" and satisfied the newness prong of Rule 61(d)(2). The State has not challenged this finding, and we agree that the USDOJ/FBI disclosure regarding MHC evidence is new.

The next question is whether the new evidence is persuasive. In accordance with the standard set forth above, we view Bass's "new evidence in light of the evidence presented at trial and in light of the other unadmitted material."[167] Bass must establish "that the new evidence, when considered in the context of all the relevant evidence by a properly instructed jury, is such as will probably change the result if a new trial were granted."[168]

---

[166] *Super. Ct. Op.*, 2022 WL 2093956, at *9.

[167] *Purnell*, 254 A.3d at 1114.

[168] *Id.*

55

Applying this standard, we find no error in the Superior Court's conclusion that Bass did not meet his heavy burden of showing that the result of his trial will probably change. Nothing about Bass's new evidence gives rise to an inference that Bass did not commit the robberies and burglaries. That is because the new evidence does nothing to exculpate Bass. As the Superior Court noted, MHC is not a "defunct science" and the FBI retested the hair samples in 2019, again concluding that Bass was "a possible source of the hair."[169] The FBI's supplemental mtDNA testing did not eliminate Bass as the source, concluding instead that he "cannot be excluded as the source." Nor did it indicate anyone else was the source of the hair.[170]

---

[169] *Super. Ct. Op.*, 2022 WL 2093956, at *10.

[170] *See supra* note 77. At oral argument before this Court, Bass agreed that it was appropriate for this Court to consider the mitochondrial DNA testing. The following exchange took place:

> The Court: You mention the mitochondrial DNA testing, and I think there's something in the record suggesting that it's possible for only 1 out of every 135 African Americans to have the same mitochondrial DNA sequence obtained from the S.K. sample and from Bass. What, if anything, are we to do with that piece of evidence?

> Counsel: Your Honor, in a retrial, I mean today, the issue on appeal is whether we've overcome a procedural bar, but let's say hypothetically that there's a retrial, that evidence, I concede would be admissible. Mitochondrial DNA cannot be used to identify an individual, according to the FBI's report, unrelated people may have the same sequence of DNA on a particular strand, and Mr. Bass's partial DNA sequence appeared in 11 out of 2,449 samples in the database of mitochondrial DNA.

> The Court: Can we consider those facts as we assess your showing of that evidence?

> Counsel: Yes. It's only fair. I have new evidence, 2015 DOJ investigation into all these thousands of cases, and I did not oppose, it's incredible that they found evidence from 1983, we moved courthouses, we found it and so it was tested and I think it would be fair game in any retrial and also for consideration by this Court. But mitochondrial DNA as the court found, the Superior Court found, cannot be

Although, the new evidence weakens a key element of the State's case — the identification of Bass — there is substantial and sufficient other evidence supporting the jury's finding that Bass was the perpetrator, and Bass's new evidence does not undermine, in any way, the substantial other evidence the jury considered.[171] We address this other evidence below.

### i.    Modus Operandi

As the Superior Court noted, "[t]he jury was free to consider the similarities in these cases"[172] and "the independent culpability of [Bass] as to each assault or whether the series of assaults were committed by one assailant."[173] The similarities in the cases are many. More generally, each of the assaults took place in office buildings in the North Wilmington

---

used as a means of identification, it would be evidence that would be presented by the State in retrial and it would be vigorously cross-examined as to the differences between mitochondrial DNA and nuclear DNA, where we routinely, when I do trials, see numbers like 1 in 7 trillion and things like that.

Oral Argument at 10:01–12:02; *see also* App. to Opening Br. at A1004–05 (Stipulation and [Proposed] Order, dated Feb. 6, 2019) (stating that "Bass agrees to provide a DNA sample, which will be forwarded to the FBI as part of the DNA testing," and that "[e]xcept as otherwise ordered by this Court, the results of the FBI's analysis and testing under this stipulation shall be kept strictly confidential"); *id.* at A1006–09 (Stipulation and Order, dated Sept. 23, 2020) (reporting on the results of the mtDNA testing, stating that the evidence has been properly authenticated, that the results are no longer confidential, and ordering supplemental briefing deadlines).

[171] As the *Commissioner's Report*, 2021 WL 5984262, at *19, put it:

In this case, with the exception of the overstatements of the MHC expert, all other aspects of the State's case against Bass remain in place. The re-test results of the MHC evidence do not exonerate Bass in any respect. There have been no new discoveries of any factual evidence that calls into question the verdict. No physical evidence has surfaced that undermines the State's case against Bass. The State's case against Bass through direct and circumstantial evidence was substantial and remains in place.

[172] *Super. Ct. Op.*, 2022 WL 2093956, at *10.

[173] *Id.* at *11.

and Claymont area, within a few miles of each other and close to where Bass was living at the time. The victims were all young women who were working in the office buildings at the time of the attacks. The specifics of each attack, testified to by each victim, demonstrate a pattern of activity once the assailant entered the offices. The women explained that, upon entering their office and afterward, the assailant physically assaulted them or forcefully threatened them. Specifically, he shoved a screwdriver into the victim's side (in the case of S.K. and A.S.), put his hand over their mouth, or hit them. He ordered the victims not to look at him and he obstructed their view of his face by covering their face, or his face, with clothing. The assailant robbed each victim by demanding both money, cash and checks, and their jewelry.

Each victim testified that she was then kidnapped: the assailant forced the victim to move into another, secluded room in the office building, where he either physically or sexually assaulted her. In two cases, that of S.K. and A.S., the assailant tied the victim's hands and feet together with rope or wire found in the office, vaginally raped them, and then left them in the same room, tied up. Each rape lasted for a period of less than two minutes, during which the assailant had trouble maintaining an erection and did not ejaculate. The Superior Court found that the evidence indicates that the third victim, S.M., was not raped (in addition to being kidnapped and physically assaulted) only because she lost control of her bladder and relieved herself involuntarily.

Finally, each of the three victims described their assailant's physical appearance and demeanor in the same way at trial. They stated he was a Black male, between 20- to 30-years-old, thin, and approximately 5'8" to 6'0" in stature. At trial, Bass was 32-years-old,

58

5'11" and 20 pounds heavier than his arrest weight of 152 pounds. Two of the victims further described their attacker as having a calm, soft, or soothing voice. Moreover, each victim, as well as Christine Shaw, identified the assailant as being well-dressed, in office clothes or golf clothes. A.S. and Mr. Reynolds, a building manager in the office building where S.M. was attacked, identified the assailant as wearing gray loafers.

### ii. *Corroborating Crimes and Testimony*

Bass concedes that "it is certainly true that certain elements of the crimes established a *modus operandi*," but he claims that this "only established the same person very likely committed all three attacks," not that *he* committed the attacks.[174] But the jury heard the other evidence at trial, including Bass's own testimony, supporting their ultimate conclusion that Bass committed each of the attacks, and specifically tying Bass to two of the victims. This evidence does not rely, in any respect, on MHC evidence, and it is persuasive circumstantial evidence supporting the Superior Court's ruling.

First, the jury heard testimony from Bass's long-time friend, Ms. Schoell. Ms. Schoell's testimony "established a nexus between [Bass] and the offices of at least two of the victims."[175] She confirmed that Bass lived with her in Claymont at the time each attack occurred, and that Bass and she engaged in a scheme wherein they would break into office buildings to steal cash and checkbooks. When doing so, Bass would dress up like an office worker to avoid detection. Ms. Schoell specifically testified that she and Bass had been to

---

[174] Opening Br. at 41.

[175] *Super. Ct. Op.*, 2022 WL 2093956, at *10.

the office building where S.M. was later attacked. Ms. Schoell confirmed that she cashed two of S.M.'s checks, which Bass had stolen from the office on that day — July 16, 1982, the day of S.M.'s office party. She further testified that she cashed checks, which Bass had given her, belonging to A.S.'s co-worker, days before the attack on A.S. occurred.

Bass's own testimony partially corroborated that of Ms. Schoell. Bass testified that he supported himself by stealing checks and other valuables from office buildings in the Wilmington area. The jury also heard that when Bass would commit these robberies, he would dress up as an office worker to avoid detection. Bass further stated that Ms. Schoell would drive him to the locations where he would commit the thefts. However, he denied having been to any of the victim's office buildings, or stated he could not recall whether he had been, and he denied raping or assaulting anyone. Both Bass and Ms. Schoell confirmed that the gray loafers identified by more than one witness at trial, belonged to Bass.

### iii. *Victim and Witness Identifications*

Finally, the State presented either witness or victim identification testimony as to each of the assaults. S.K. positively identified Bass as her attacker in court. A.S. stated that Bass resembled her attacker, but she could not be certain it was him. She had previously picked him out in two prior photo lineups as the man most resembling her attacker. Although the final victim, S.M., never saw her attacker's face, two eyewitnesses gave testimony at trial in favor of the State. One eyewitness, Ms. Shaw, positively identified Bass as being in the office building on the day of S.M.'s assault and did so both prior to trial and at trial. The second, Mr. Reynolds, selected Bass as the man he had seen

in the office that same day from a photo lineup based on the "definite formation" of the man's forehead.

Bass argues that "[e]very identification in the case was weak, contradictory, or induced by police or [Delaware] DOJ personnel."[176] The Superior Court found that, in each case, the record demonstrated that each identification had been challenged on cross-examination, the jury was free to weigh the credibility of the identification, and the State established Bass's guilt.[177]

### (A)  S.K.

S.K. failed to identify Bass as her attacker prior to trial but unequivocally identified him at trial. Bass argues that this identification was tainted because the State told S.K. that Bass, whom they believed was her attacker, would be seated at one of the tables in the courtroom. However, Bass's trial counsel cross-examined S.K. as to her identification of Bass. S.K. testified that the prosecution had no influence on her and that she "didn't know if [she] was going to walk in and it was going to look exactly like him."[178] She explained, during her testimony, that the photos did not "really show it all" and that once she saw Bass in person, she was certain of his identity as her attacker.[179] The jury was free to make a credibility determination as to S.K's testimony.

---

[176] Opening Br. at 43.

[177] *Super. Ct. Op.*, 2022 WL 2093956, at *12.

[178] *Id.* at *11 n.157; *accord* App. to Opening Br. at A171 (S.K. Trial Test. at 65:17–18).

[179] *Super. Ct. Op.*, 2022 WL 2093956, at *3, *3 n.54; *accord* App. to Opening Br. at A174 (S.K. Trial Test. at 68:9–10).

## (B) A.S.

A.S. never positively identified Bass, either in court or prior to court. She instead chose Bass out of two photo lineups as most resembling her attacker and told the jury as much at trial. Bass takes issue with A.S.'s prior identification of Bass in the second photo lineup she viewed because Bass's photo was the only one which remained from the first photo lineup to the second, and the photograph of the one other person who A.S. stated resembled her attacker had been removed from the lineup. Bass also argues that A.S.'s testimony was weak evidence of identity because she failed to identify Bass's gray loafers as the shoes worn by her attacker.

We confronted Bass's first argument regarding A.S.'s flawed photo lineup on direct appeal and found that the second photo lineup was not unduly suggestive.[180] We noted that any misstatements by the prosecution came *after* A.S. had viewed the second photo lineup, and that the State withdrew the third photographic array evidence from the case. Moreover, we found that A.S. had been subject to cross-examination and argument concerning the weight to be accorded the evidence.[181] Bass's new evidence does not implicate A.S.'s photo lineup identification and we find no reason to depart from this Court's prior ruling.

As for Bass's shoes, A.S. testified that the color of the shoes was the same as those of her attacker and that the color was unusual. She testified that the shoes were "very

---

[180] *See supra* Part II.B.2.

[181] App. to Opening Br. at A706 (Denial of Direct Appeal at ¶ 13).

similar except for the texture, as [she] remember[ed] it."[182]  Even though A.S. failed to match the shoes as those exactly of her attacker, her testimony is still probative of her attacker's identity as Bass:  it corroborates that her attacker dressed like an office worker, like Bass, and owned gray loafers, like Bass.

(C)  S.M.

Finally, Bass takes issue with the eyewitness identifications in S.M.'s attack.  He argues that Ms. Shaw's in-court identification was flawed because, after she had identified Bass in a photo lineup, a detective indicated to Ms. Shaw that she had chosen the suspect. Bass's argument does not change the fact that Ms. Shaw unequivocally, positively identified Bass during the initial photo lineup, and gave a detailed description of him at trial.

Moreover, Bass argues that Mr. Reynolds's photo lineup identification could not be relied upon because Mr. Reynolds only had an obstructed view of the suspect through a bathroom stall and because a detective testified that he believed Mr. Reynolds was under the impression that the suspect's photo would be in the photo lineup.  But the jury was aware of these facts.  Mr. Reynolds acknowledged he had an obstructed view,[183] and the

---

[182] *Id.* at A268 (A.S. Trial Test. at B16:18–19).  She confirmed the color was "very unusual."  *Id.* at A245 (A.S. Trial Test. at 139:14–15); *Super. Ct. Op.*, 2022 WL 2093956, at \*3 n.63 ("A.S. testified the shoes were the same unusual gray color and slip-on, but the shoes at trial were a dull leather and not the suede she remembered from her attack.").

[183] The following testimony was taken:

> Q: When you went through and picked this out, did you state to the police officer that you definitely recognized the person or that it just – the person you picked, in your own estimation, had a similar type feature?

> A: I said that the forehead looked similar.

63

detective did not say why he had such an impression, denying that he told Mr. Reynolds that Bass was the suspect or that there was a photo of him in the lineup.[184] Bass also points out that Mr. Reynolds failed to identify Bass's shoes as those of the man in the bathroom stall on the day of the attack. Still, Mr. Reynolds testified that they "looked like the same shoes," and at the very least, the testimony corroborates that the attacker wore gray dress shoes, like Bass.[185]

Bass's trial counsel cross-examined the witnesses regarding their identifications. And in each case, the jury was free to make credibility determinations as to the identification evidence put forth by each witness. We agree with the Superior Court that challenges to any flaws in the identification processes are insufficient to disturb the jury's verdicts. In sum, we agree with the Superior Court that Bass failed to show that the new evidence, when considered in the context of all the relevant evidence by a properly instructed jury, is such as will probably change the result if a new trial were granted.

---

Q: Looked similar?
A: Uh-huh.
Q: But you couldn't positively say that in fact was the person that you saw?
A: *I couldn't see the person. No.*
Q: Because you didn't see anything but a couple inches of the top of his head?
A: Right.

App. to Opening Br. at A396 (Roger P. Reynolds Trial Test. at B142:7–16) (emphasis added).

[184] *Id.* at A452 (Kenneth J. Castelline Trial Test. at C38:14–16) ("Did you tell him that the suspect was Alan Bass or that that particular photograph was one of Alan Bass? No, I did not.").

[185] *Super. Ct. Op.*, 2022 WL 2093956, at *4; App. to Opening Br. at A394 (Roger P. Reynolds Trial Test. at B140:13).

## V.    Conclusion

The revelations about MHC testimony that have come to light since Bass's trial warrant a reviewing court's serious attention and consideration. We have undertaken such a review. In this particular case, we agree that Bass has not met his burden to establish that the erroneous testimony offered by Podolak, and the new understanding regarding the limits of MHC analysis for individual identification, as indisputably new evidence, create a strong inference that Bass is actually innocent. The Superior Court did not abuse its discretion when it denied Bass postconviction relief. Thus, this is not the "extraordinary case" where the defendant has met his heavy burden to overcome the procedural bar of Rule 61(d)(2). Accordingly, we AFFIRM the judgment of the Superior Court.